UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SABRINA JONES,

                       Plaintiff                       DECISION AND ORDER

-vs-

                                                         16-CV-6042 CJS

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                       Defendant.
_____

APPEARANCES

| | |
|---|---|
| For the Plaintiff: | Justin M. Goldstein |
| | Kenneth R. Hiller |
| | Law Offices of Kenneth Hiller |
| | 60000 North Bailey Avenue, Suite 1A |
| | Amherst, New York 14226 |
| For the Defendant: | Susan J. Reiss |
| | Social Security Administration |
| | Office of General Counsel |
| | 26 Federal Plaza, Room 3904 |
| | New York, New York 10278 |
| | Kathryn L. Smith, A.U.S.A. |
| | Office of the United States Attorney |
| | for the Western District of New York |
| | 100 State Street |
| | Rochester, New York 14614 |

INTRODUCTION

      This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Sabrina Jones ("Plaintiff") for Disability Insurance

Benefits and Supplemental Security Income Benefits.  Now before the Court is

1

Plaintiff's motion (Docket No. [#9]) for judgment on the pleadings and Defendant's cross-motion [#13] for judgment on the pleadings. Plaintiff's application is granted and Defendant's application is denied.

BACKGROUND

The reader is presumed to be familiar with the parties' submissions, which contain detailed recitations of the pertinent facts. The Court has reviewed the administrative record [#7] and will offer only a brief summary of those facts.

On November 26, 2012, Plaintiff filed for benefits, claiming to have become disabled from working on June 9, 2011. Plaintiff stated that her impairments were physical in nature.[1] In that regard, the record indicates that on June 9, 2011, Plaintiff was working as a housekeeper[2] at Strong Memorial Hospital, when she tripped over her cleaning-supply cart and fell to the floor, resulting in pain in her left knee, left hip and left thumb. *See, e.g.*, (181, 223, 234). Plaintiff described the impairment as "a burning and aching feeling in [her] hip and knee and [an "aching feeling" in her] thumb." (234).

Plaintiff subsequently added depression to this list of impairments. In that regard, Plaintiff stated that she feels depressed because she cannot continue working in her chosen field as a cleaner, due to her physical pain. (46, 50-51). Although Plaintiff has not worked as a cleaner since her accident, she subsequently became certified as a daycare provider, and cares for three children in her home, whose ages are one,

---

[1] When Plaintiff applied for benefits, she listed only physical ailments ("Left thumb, hip and knee injuries."), and stated that she had no appointments scheduled for any mental or emotional conditions. (219, 222).

[2] Plaintiff has worked primarily as a housekeeper, often in hospitals, and as a patient care technician. (220).

2

seven and ten. (40).

Generally, the medical evidence shows that Plaintiff received conservative medical care following her accident, and that her injuries have improved, but that she still claims to experience disabling pain. Plaintiff's hip and knee injuries were treated with rest, pain treatments and physical therapy, while her thumb injury required surgery. For her pain, Plaintiff uses ibuprofen, lidoderm patches and a transcutaneous electric nerve stimulation ("TENS") unit, as needed.

On December 16, 2011, Brian Giordano, M.D. ("Giordano") reported that Plaintiff continued to have tenderness upon palpation over her left hip joint, but that she had full "pain free" movement of the hip. (177). On January 10, 2012, Plaintiff told Giordano that her knee pain had improved overall, and Giordano noted that after exhausting "all conservative measures" "her [knee] symptoms [were] manageable for her." (175). Plaintiff stated that the knee bothered her "occasionally with kneeling, sitting for prolonged periods of time or strenuous activities." (175). Giordano reported that Plaintiff was "walking with a minimally antalgic gait, not using an assistive device." (175). On January 30, 2012, Giordano reported that Plaintiff was complaining of pain in the left knee and hip, but that she was still capable of working light duty, with lifting restrictions. (169). On October 17, 2012, Giordano indicated that Plaintiff was in no acute distress, and had only "mild" limitations in her ability to move her left hip and left knee joints. (156). On October 15, 2012, Giordano indicated that Plaintiff had reached maximum medical improvement, with only mild residual limitations. (153). Giordano noted that Plaintiff was using "conservative modalities" to treat her pain, and that he had advised her to follow up with him as needed. (153).

3

Plaintiff's thumb injury consisted of a ligament injury that was initially treated non-operatively. (165). Plaintiff subsequently developed "trigger thumb," and on December 22, 2011, she had surgery. On July 12, 2012, John Elfar, M.D. ("Elfar") reported that Plaintiff had reached maximum medical improvement following surgery on her thumb six months earlier. (160). Elfar stated that the surgery had "largely resolved" Plaintiff's trigger thumb condition. (160). Plaintiff reported that her pain was "a lot less" than before the surgery, and that she was "doing well overall." (160). Elfar stated that, "[o]verall, she has excellent use of her thumb." (160). A nurse practitioner noted that Plaintiff "ha[d] good range of motion in her thumb," and no pain. (164). The same nurse practitioner indicated that any disability relating to Plaintiff's thumb was "mild." (165).

On April 3, 2012, Andre Lefebvre, M.D. ("Lefebvre") issued a report that summarized the various treatments that Plaintiff received following her accident, as well as his own physical examination of Plaintiff. (180-192). At the conclusion of the report, Lefebvre opined that while Plaintiff still had some physical limitations relating to the accident, they were temporary, and that Plaintiff retained the ability to work. (191).

On February 25, 2014, a hearing was conducted before an Administrative Law Judge ("ALJ"). Plaintiff appeared without a representative, and the ALJ explained to her that she had the right to a representative. The ALJ stated that if Plaintiff chose to proceed *pro se*, the ALJ herself would "obtain the necessary medical and other evidence." (30). Plaintiff elected to represent herself. (30).

Plaintiff testified that she took ibuprofen as needed for her hip and knee pain, and also used lidoderm patches and a TENS unit. (48, 50). Plaintiff indicated that those treatments were helpful, but did not completely alleviate her pain. (50). Plaintiff

4

stated that she stopped attending counseling sessions for depression in 2012, and that she was not currently taking medication for depression. (46-51). Plaintiff stated, though, that her doctor planned to place her back on depression medication at a later time. (52).

As the ALJ was reviewing the evidence that had been submitted, she stated, "we don't have all current medical evidence," and told Plaintiff that she would "request updated medical records from Highland Family Medicine so that we can get additional evidence[.]" (32-33, 38). In that regard, Plaintiff had indicated that she continued to receive treatment from Highland Family Medicine, but the ALJ observed that the file was missing treatment notes from December 2012 onward. (38-39). The ALJ told Plaintiff that she would request additional records from Highland Family Medicine, and would provide Plaintiff with a copy of whatever was received, and that Plaintiff would have the opportunity to "to request a supplemental hearing." (66).

Plaintiff indicated that, apart from Highland Family Medicine, she had not received any other treatment since 2012:

> Q. Other than Highland Family Medicine, have you receive[d] any other treatment through 2013 or to the present?
> A. No.
> Q. Okay. Have you gone to any emergency rooms or anything like that?
> A. No.

(38-39). Plaintiff noted that her workers' compensation case had remained pending until May 2013, when it was settled, but she did not indicate that she had been seen by any workers' compensation doctors during 2013 or 2014. (43).

Highland Family Medicine is a department of Highland Hospital, which is under

the umbrella of the University of Rochester Medical Center ("URMC"). Presently, the URMC website indicates that medical records pertaining to treatment at Highland Hospital must be requested from one address, while records pertaining to "clinic or office visits" must be requested from a different address.[3] Specifically, the address for Highland Hospital is 1000 South Avenue, Box 55, Rochester, New York 14620, while the current address for Highland Family Medicine is 777 South Clinton Avenue, Rochester, NY 14620. However, some of the earlier records from Highland Family Medicine in the record, from 2010-2012, bear the same address as Highland Hospital, which is 1000 South Avenue, Box 55, Rochester NY 14620. (Exhibit 11F, 492-505). The ALJ requested additional medical records from Highland Family Medicine, but sent the request to the Highland Hospital address, which evidently was incorrect. The ALJ subsequently received a response, indicating that were no treatment records for Plaintiff during the period requested. However, the ALJ did not notify Plaintiff of that fact.

On September 24, 2014, the ALJ issued a written decision denying Plaintiff's claim for benefits. (10-21). Applying the familiar five-step sequential analysis used for evaluating disability claims, the ALJ found at the first three steps, respectively, that Plaintiff had not engaged in substantial gainful activity since June 9, 2011; that she had severe impairments consisting of left knee dysfunction (meniscal sprain), left hip dysfunction (mild valgus deformity) and partial tear of ligament in left thumb with surgical repair; and that none of those impairments met or medically equaled a listed impairment. (12-14). The ALJ also found that Plaintiff had non-severe impairments

---

[3] https://mychart.urmc.rochester.edu/mychart/faqs.html#MR_copy

including depression and anxiety. (13). Prior to reaching the fourth step of the sequential analysis, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform less than the full range of sedentary work. More specifically, the ALJ found that Plaintiff could perform all aspects of sedentary work, except that she needed to be able to change positions periodically. (15). The ALJ indicated that Plaintiff's alleged pain and depression would not interfere with her mental ability to perform work. (15).

On January 26, 2016, Plaintiff commenced this action. On December 29, 2016, Plaintiff filed the subject motion [#9] for judgment on the pleadings, and on April 12, 2017, Defendant filed the subject cross-motion [#13] for judgment on the pleadings. On May 11, 2017, counsel for the parties appeared before the undersigned for oral argument.

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

## DISCUSSION

Plaintiff contends that the ALJ erred in various respects, each of which the Court

7

will consider below.

### Application of the Grids

Rule 201.14 of the Medical-Vocational Guidelines ("Grids") indicates that a person with a maximum sustained work capacity of sedentary work, who is "closely approaching advanced age," who is a "high school graduate or more," and whose past work was "skilled or semiskilled – skills not transferable," should be found disabled.[4] The term "closely approaching advanced age" means someone who is between the ages of 50 and 54. 20 C.F.R. § 404.1563(d). On the other hand, someone under age 50 (considered a "younger person," 20 C.F.R. § 404.1563(c)), who is limited to sedentary work, who is a "high school graduate or more," and whose past work was "skilled or semiskilled – skills not transferable," is considered not disabled under the grids.[5]

However, the regulations indicate that these rules will not be applied "mechanically in borderline situation":

> We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

20 C.F.R. § 404.1563(b). Some courts have interpreted the phrase "within a few days to a few months of reaching an older age category" to mean up to six months of

---

[4]Code of Federal Regulations, Appendix 2 to Subpart P of Part 404, Table 1, Rule 201.14

[5]Code of Federal Regulations, Appendix 2 to Subpart P of Part 404, Table 1, Rule 201.21

8

reaching an older age category, while other courts have held that three months is the outer limit. *Compare*, *Smolinski v. Astrue*, No. 07-CV-386S, 2008 WL 4287819, at *4 (W.D.N.Y. Sept. 17, 2008) ("Among the district courts in the Second Circuit, three months appears to delineate the outer limits of 'a few months.'") (citations omitted) with *Rodriguez v. Comm'r of Soc. Sec.*, No. 15-CV-6596 (ALC), 2016 WL 5660410, at *8 (S.D.N.Y. Sept. 30, 2016) ("Although the regulations do not clearly define the outer limits of a borderline situation, several courts have held that a period of up to six months is within the rule[.]") (citation omitted).

In the instant case, the ALJ had to decide whether, for purposes of disability insurance benefits, Plaintiff was disabled on or before her date last insured, December 31, 2014, and whether, for purposes of SSI benefits, Plaintiff was disabled at any time between the date of her application, November 26, 2012, and the date of the ALJ's decision, September 24, 2014.[6] At all relevant times, Plaintiff met the education and work experience requirements of Grid Rule 201.14. However, as of December 31, 2014, Plaintiff, who was born in November 1965, had just turned 49, and was a "younger person" for purposes of the grids. Therefore, Plaintiff would be classified as "not disabled" under the grids, Rule 201.21. Plaintiff was not a "borderline situation," since she would not turn 50 until more than a year after the date of the ALJ's decision. Accordingly, the ALJ did not err in her application of the grids.

Plaintiff nevertheless contends that the Appeals Council erred by failing to apply

---

[6]*See, Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 485 n.1 (2d Cir. Jun. 13, 2012) (Noting that the relevant time period for an SSI benefits application is "the date the SSI application was filed, to...the date of the ALJ's decision").

9

Grid Rule 201.14 to find her disabled. In that regard, Plaintiff argues that the Appeals Council did not issue its decision until December 3, 2015, by which time she had turned 50, which put her in the category of "closely approaching advanced age." Plaintiff contends that the Appeals Council actually should have treated her case as a "borderline situation," and found her disabled six months earlier, as of the date that she turned forty-nine-and-a-half. According to Plaintiff, "remand is required solely for calculation of benefits as of May 28, 2015."[7]

The Government responds that this argument is incorrect, since the relevant date, for determining Plaintiff's age, is the date of the adjudication by the ALJ, not by the Appeals Council. According to the Commissioner, Plaintiff's age as of the date of the Appeals Council decision is irrelevant.

The Court agrees with the Commissioner that, in the instant case, Plaintiff's age as of the date of the Appeals Council decision is not the proper age to use when applying the grids. In this regard, the Appeals Council declined to review the ALJ's decision, and therefore the date of the Commissioner's final decision is the date of the ALJ's decision, which is September 24, 2014. At that time, Plaintiff was 48 years old. Therefore, Plaintiff's argument that she was entitled to be found disabled under Grid Rule 201.14, or that this was a "borderline situation," lacks merit. *See, Russell v. Bowen*, 856 F.2d 81, 83-84 (9th Cir. 1988) (Rejecting claimant's argument that the relevant date, for purposes of applying the grids, was the date of the Appeals Council's decision, because, where the Appeals Council declines to review an ALJ's

---

[7]Pl. Memo of Law [#9-1] at p. 15.

determination, the ALJ's determination is the Commissioner's final determination, and the date of that determination is the correct one to use for purposes of determining the claimant's age when applying the grids: "[P]etitioner argues that he was 60 years 2 months before the Appeals Council decision was rendered. [However,] [t]he Secretary's position is correct. First, at the time of the *final decision*, petitioner was not yet 60. Second, this is not a borderline case. Petitioner was . . . in fact closer to age 59 than to age 60.") (emphasis added); *accord, Knoblauch v. Colvin*, No. 3:13–cv–02598–GBC, 2015 WL 1471564 at *9 (M.D.Pa. Mar. 31, 2015) (Where Appeals Council denies review, relevant date for purposes of determining the claimant's age, when applying the grids, is the date of the ALJ's final decision); *Meyer v. Astrue*, No. CV 12-89-M-DLC-JCL, 2013 WL 1615893, at *8 (D. Mont. Feb. 22, 2013) ("When the Appeals Council denied Meyer's request for review, the ALJ's decision became the Commissioner's final decision for purposes of judicial review. In such a case, the date of the ALJ's decision is the relevant date for purposes of identifying the claimant's age category and applicable grid rule.") (citation omitted), report and recommendation adopted, No. CV 12-89-M-DLC-JCL, 2013 WL 1615869 (D. Mont. Apr. 15, 2013).

Development of the Record

Plaintiff next maintains that the ALJ failed to develop the record by obtaining evidence, covering the period from December 2012 up until the hearing, from three sources: Genesee Mental Health, Highland Family Medicine, and the Workers' Compensation doctors. Further, Plaintiff contends that the ALJ failed to notify her when the request for records from Highland Family Medicine was returned unsatisfied. Plaintiff maintains that these errors require a remand. The Court agrees that a remand

11

is required, though not all of Plaintiff's arguments on this point are valid.

"It is the rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 508-509 (2d Cir. 2009) (citation and internal quotation marks omitted). In that regard, the regulations indicate in pertinent part:

> Development. Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application. We will make every reasonable effort to help you get medical evidence from your own medical sources and entities that maintain your medical sources' evidence when you give us permission to request the reports.

20 C.F.R. § 416.912(b)(1). "Where the claimant is appearing *pro se* the ALJ has 'a heightened duty to develop the record in order to ensure a fair hearing.'" *Warren v. Astrue*, No. 12-CV-06043, 2013 WL 425938, at *2 (W.D.N.Y. Feb. 1, 2013) (*quoting Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 83 (2d Cir.2009)). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (citation and internal quotation marks omitted).

Preliminarily, the Court does not agree that the ALJ had a duty to request additional records from Plaintiff's Workers' Compensation doctors. In that regard, the record already contains records from those doctors (including Giordano) covering the

12

period from Plaintiff's injury through December 2012.  Moreover, the ALJ specifically asked Plaintiff whether she had been seen by any doctors between December 2012 and the date of the hearing, and she indicated that she had been seen only by staff at Highland Family Medicine. (38-39).  Accordingly, the ALJ did not err by failing to seek additional records from the Workers' Compensation doctors.

As for the ALJ's alleged failure to develope the record regarding Plaintiff's treatment at Genesee Mental Health, the Court notes that the record does not contain any records from that treatment provider.  However, it appears that the ALJ might not have understood that Plaintiff was also receiving counseling through Genesee Mental Health in addition to the treatment that she was receiving at Highland Family Medicine. (13) (ALJ's decision notes that Plaintiff received mental health treatment "from her primary care provider.").  In that regard, during the hearing, Plaintiff testified that she had received "mental health counseling or treatment . . . for depression," but did not mention Genesee Mental Health by name. (51).  Moreover, in her written submissions, Plaintiff indicated that she was receiving treatment for depression, anxiety and adjustment disorder through the office of her primary care physician at Highland Family Medicine (279, 284), and the record contains numerous treatment notes from that office referencing Plaintiff's condition. (*See, e.g.*, 335, 469, 475, 494-496, 498, 503).

Plaintiff nevertheless contends that the ALJ should have obtained records from Genesee Mental Health, since some of the office notes from Highland Family Medicine reference the fact that Plaintiff was attending counseling at Genesee Mental Health. (335, 462).  The Court does not necessarily agree that the ALJ's failure to catch such passing references in a medical record that otherwise appeared complete would require

13

remand. *See, Herrera v. Colvin*, No. 14 CIV. 7802 (RWS), 2016 WL 1298990, at *7 (S.D.N.Y. Mar. 31, 2016) ("Herrera suggests that the ALJ had a duty to further develop the record because she obliquely referenced a therapist at the hearing, but in this case, with a complete medical history and no obvious gaps in the record, the ALJ was not required to seek further information before reaching a determination on disability."). However, because the matter is being remanded anyway for reasons discussed below, the ALJ should, on remand, obtain records from Genesee Mental Health.

Continuing on, the Court agrees that the matter must be remanded because the ALJ failed to obtain additional records from Highland Family Medicine, and failed to notify Plaintiff when the record request was returned unfulfilled. "The duty of an ALJ to develop the record is particularly important when obtaining information from a claimant's treating physician due to the treating physician provisions in the regulations." *Dickson v. Astrue*, No. 1:06-CV-0511 NAM/GHL, 2008 WL 4287389, at *13 (N.D.N.Y. Sept. 17, 2008) (citations and internal quotation marks omitted). Moreover, an ALJ is supposed to proffer evidence received after the hearing to the claimant, and to offer the claimant an opportunity for a supplemental hearing concerning the proffered evidence. HALLEX I-2-7-1(B)-(C). Further, the ALJ must offer the claimant a supplemental hearing on the proffered evidence if he told the claimant that the claimant would be given such an opportunitiy. HALLEX I-2-7-1(C) ("[I]f the ALJ offered the right to a hearing on the proffered evidence, even in error, the ALJ must grant any request for a supplemental hearing.").

Here, the ALJ told Plaintiff both that she would obtain updated medical records from Highland Family Medicine, and that she would provide the same to Plaintiff and

14

allow Plaintiff a supplemental hearing if Plaintiff wanted one. However, the ALJ sent the records request to an incorrect address, and therefore failed to carry out her obligation to develop the record.[8] Then, the ALJ failed to notify Plaintiff of the medical provider's response that no such records existed, or to offer the Plaintiff a supplemental hearing. These failures were contrary to the ALJ's duties under the HALLEX, and to the ALJ's statements to Plaintiff at the hearing. *See, Cespedes ex rel. Cespedes v. Barnhart*, No. 00 CIV. 7276 (GEL), 2002 WL 1359728, at *5 (S.D.N.Y. June 21, 2002) ("Given the fact that the ALJ herself attempted, but failed, to obtain Ariel's 1998 school records and, in addition, later represented to plaintiff that she would postpone decision pending receipt of Ariel's 1999 school records, it cannot be said that the ALJ met her duty to diligently develop the record."). Accordingly, the Court agrees with Plaintiff that a remand is necessary.

Plaintiff further contends that the ALJ erred by failing to obtain a consultative report regarding the effect, if any, of Plaintiff's depression and anxiety on her ability to work, because "there is no medical opinion, examining or treating, addressing Plaintiff's mental function."[9] Plaintiff therefore argues that the ALJ's determination, that Plaintiff's mental impairments are not "severe, is "unsupported."[10]

While Plaintiff contends that the ALJ should have obtained a consultative report,

---

[8]Of course, it appears unlikely that the ALJ realized that the request had been sent to the wrong address; in that regard, the response that the ALJ received did not indicate that it had been sent to the wrong place, but rather, it merely indicated that there were no records for the relevant period. Nevertheless, the fact remains that the ALJ failed to develop the record.

[9]Pl. Memo of Law [#9-1] at p. 20.

[10]Pl. Memo of Law [#9-1] at p. 20.

15

some courts define "medical opinion" more broadly than Plaintiff. *See, e.g., Sickles v. Colvin*, No. 12-CV-774 MAD/CFH, 2014 WL 795978, at *4 (N.D.N.Y. Feb. 27, 2014) ("A medical opinion, for purposes of an ALJ's disability determination, is defined as evidence, submitted to or obtained by the ALJ, containing "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [ ] symptoms, diagnosis and prognosis," the claimant's capabilities despite the impairment(s), and any physical or mental restrictions. 20 C.F.R. § 404.1527. The regulatory language provides ample flexibility for the ALJ to consider a broad array of evidence as 'medical opinions.' See 20 C.F.R. § 404.1527. As such this Court agrees . . . that the impressions indicated by the examining physicians within treatment and progress notes, found in exhibits 1F–4F, constitute the medical opinion of treating physicians.") (footnote omitted). Here, for example, the ALJ relied, in part, upon a treating doctor's description, within treatment/progress notes, of Plaintiff's depression as "mild." (13, 498).

Moreover, it is not necessarily an error for an ALJ to make an RFC determination without the aid of a medical opinion:

> [I]t is not *per se* error for an ALJ to make the RFC determination absent a medical opinion. In *Tankisi v. Commissioner of Social Security*, the Second Circuit expressly rejected the argument Lewis makes here, that the lack of a medical opinion is a fatal error requiring remand. 521 Fed. Appx. 29, 2013 WL 1296489 (2d Cir.Apr. 2, 2013). The Circuit Court held that remand is not necessary where "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." 521 Fed. Appx. At 34. In *Tankisi*, the record was found sufficient where, although the record contained no formal opinion, it did include a physician's assessment of the plaintiff's limitations. *Id*. In other circumstances, especially where the medical evidence shows

16

> relatively minor physical impairments, "an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment." *House v. Astrue*, 2013 U.S. Dist. LEXIS 13695, 2013 WL 422058 at *4 (N.D.N.Y. Feb.1, 2013) (internal quotation omitted).

*Lewis v. Colvin*, No. 13-CV-1072S, 2014 WL 6609637, at *6 (W.D.N.Y. Nov. 20, 2014). Although, some courts have held than an ALJ cannot make a similar "common sense judgment about functional capacity" involving *mental* impairments. *See, Nasci v. Colvin*, No. 6:15-CV-0947(GTS), 2017 WL 902135, at *9 (N.D.N.Y. Mar. 7, 2017) ("The Court recognizes that, where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment. However, that is not the case in the present matter. The Social Security Rulings underscore the highly complex and individualized nature of mental impairments, which may impact both exertional and nonexertional work functions.") (citations omitted).

Nevertheless, since the case is already being remanded, on remand the ALJ should clarify the basis for her determination that Plaintiff's mental impairments are not severe. If, at the time the ALJ issues a new decision, there is still no treating medical source opinion concerning the limitations imposed by such mental impairments, the ALJ should explain any decision to forego obtaining a consultative opinion.

<u>Evaluation of the Medical Evidence</u>

Plaintiff next contends that the ALJ erroneously relied upon her own medical judgment when making her RFC determination. On this point, Plaintiff correctly notes that the ALJ did not give controlling weight to any of the medical opinions of record.

17

Rather, the ALJ gave only "some weight" or "limited weight" to all of the medical opinions. (17-19). Plaintiff argues, therefore, that the ALJ must have relied upon the raw medical data to form her own medical opinion, which is impermissible, and which means that the RFC determination is not supported by substantial evidence. For example, Plaintiff indicates that the ALJ's decision to disregard the opinion of Dr. Mendoza and Nurse Practitioner Maletzke,[11] that Plaintiff can stand and/or walk less than two hours per day, and sit less than six hours per day (428), is not supported by substantial evidence. On this point, the Court understands Plaintiff to mean that the ALJ did not explain what medical opinion she was relying upon to find that Plaintiff actually *can* stand and/or walk up to two hours per day and sit up to six hours per day.

The Court agrees that upon remand the ALJ should explain what medical opinions she relied upon in formulating the RFC, in light of her decision to give only "some" or "limited" weight to all of the medical opinions. Moreover, to the extent that the ALJ continues to find some of the opinions are entitled to little weight because they are vague (e.g, Dr. Eurenius) or equivocal ( e.g., Dr. Giordano), the ALJ should consider whether it is necessary to seek clarification from the doctors.

Evaluation of Plaintiff's Credibility

Finally, Plaintiff contends that the ALJ improperly evaluated her credibility. In particular, Plaintiff makes two primary arguments: First, that the ALJ failed to properly develop the record, and then used gaps in the record to discredit Plaintiff; and second, that the ALJ misstated the facts in the record. The Court has already addressed the

---

[11] It does not appear to the Court that Dr. Mendoza actually endorsed this report. Rather, it appears that Nurse Practitioner Maletzke signed the report "for" or "on behalf of" Dr. Mendoza. (429)

18

issue of development of the record above, and to the extent that the ALJ failed to develop the record it may have affected her credibility determination.

As for her contention that the ALJ misstated facts when evaluating credibility, Plaintiff alleges that the ALJ improperly drew negative inferences from her findings that Plaintiff did not need a cane; that Plaintiff was able to perform her activities of daily living; and that Plaintiff pursued only conservative medical treatment. Plaintiff seems to argue that she needs a cane to ambulate, that she cannot perform activities of daily living, and that her medical treatment has not been conservative. However, the Court does not agree that the ALJ misstated the record concerning these points. For example, the record is replete with evidence that Plaintiff can ambulate without a cane. (See, e.g., 183). Similarly, contrary to Plaintiff's testimony that she has very limited daily activities, there is other evidence that Plaintiff can perform typical daily activities (40, 183[12], 281), including Plaintiff's acknowledgment that she is still able to provide daycare for three young children. Moreover, there was nothing improper about the ALJ describing Plaintiff's treatments -- consisting primarily of Ibuprofen and a TENS unit -- as conservative. As noted above, Dr. Giordano similarly characterized Plaintiff's treatments as conservative. (153, 175); *see, also, Knorr v. Colvin*, No. 6:15-CV-06702(MAT), 2016 WL 4746252, at *14 (W.D.N.Y. Sept. 13, 2016) (Characterizing "physical therapy, a TENS unit, NSAIDs, opioid analgesics, muscle relaxants, anti-convulsant medications, palliative injections, [and] chiropractic

---

[12]"She is able to dress and undress herself. She is able to perform her hygienic care. She does not wear any braces or use any ambulatory assistive devices. She is able to go up and down stairs. She is able to squat and kneel. She is able to drive. . . . She lives by herself in the house. She performs her own chores by pacing herself. Outdoor activities consist of going to the grocery store."

adjustments" as "conservative treatments.").

CONCLUSION

Plaintiff's application for judgment on the pleadings [#9] is granted, and Defendant's cross-motion [#13] is denied. This matter is remanded to the Commissioner for further administrative proceedings, pursuant to 42 U.S.C. § 405(g), sentence four. The Clerk of the Court is directed to close this action.

So Ordered.

Dated: Rochester, New York  ENTER:
      May 22, 2017

                                          /s/ Charles J. Siragusa
                                          CHARLES J. SIRAGUSA
                                          United States District Judge